Next case is Schwartz v. Accuratus, Corporation No. 14-4002. May it please the Court, good morning. My name is Reuben Honig from the firm of Dahlman Honig. I'm appearing today with Tammy Markowitz from my office, and we represent the plaintiff's appellants in this case. With the Court's permission, I'd like to reserve six minutes of rebuttal time. That's a little much. We'll give you five. Thank you, Your Honor. I appreciate that. There are some cases that warrant a longer period to argue in chief, and I thought this was the kind of case that may warrant a substantial rebuttal period, but I'll be mindful of that. This case presents on appeal a very narrow but nonetheless very important issue and principle of New Jersey law dealing essentially with the duty and duty analysis of a property or operational owner of an operation that creates a risk of harm. Sure, and we always read these briefs. I think we're pretty on topic. The question that immediately came to me is, why should we decide this? Is this the kind of case that we should be asking the New Jersey Supreme Court to look at? Should we be certifying this question? I think not, Judge Jordan. I think this is a case that's right in the wheelhouse of every federal court, either at the district court level or in the case of a reviewing panel such as this one. We're applying state law, though. It's not a federal question. There is no question that this is a narrow question of New Jersey state law. When you say it's a narrow question, doesn't this have pretty broad ramifications? I mean, if we were to say that the rule in Olivo is not limited to the spouse of an affected worker, but it's a broader rule than that, I don't think that's what this panel should do. Isn't that the kind of policy decision that we ought to let the Supreme Court or the high court of the state deal with? I don't think that this court should do that, nor have we proposed that you do that. You're suggesting that the limiting factor should be, quote, of an employee's household or individuals coming in close and frequent contact with the employee, end quote, correct? It's true, Judge Barry, that we believe the fair reading of Olivo is broad enough to encompass household members. Well, that was the facts of Olivo would, of course, well, that was the wife who did household duties. It didn't say members of the household. It did not. What is a member of the household? Someone with whom you regularly reside or live. Well, how about a live-in housekeeper? Yes. Would that be a member of the household? Would a babysitter who sleeps overnight two nights a week be a member of the household? The answer for me, Your Honor, would be yes to both. However, the assignment of error that we propose here is really quite narrow. Olivo, recall, answered the question whether take-home exposure from an ExxonMobil property in which asbestos was used, whether a duty from that property and operator can extend to the wife who never set foot on the property, who was not an employee. Traditionally in tort law, courts have looked at it through the prism of premises liability, and the courts in New Jersey and in Pennsylvania and throughout most of the United States looked at it by determining the legal status of the individual involved. So in the case of a slip-and-fall on premises, for example, the court would ask, are you a business invitee, are you a licensee, are you a trespasser? And your rights on the property or surrounding the property would flow from that. The important principle here, and the one we're asking this court to embrace, is that New Jersey no longer looks at legal status without more. So that's not controversial. So when you say you ask us to embrace it, I don't think there's any problem embracing it because you're right. Olivo says that's the law. Virtus says that's the law. That's the law. The question is, since Olivo was specific, quite specific, in saying, don't worry, we're not talking about limitless liability here, we're talking about the spouse, and it was certainly foreseeable that the spouse would be involved day-to-day in ordinary household chores like helping do laundry. So it's not something to worry about. When you say this is quite narrow, it's potentially not narrow. Respectfully, Judge Jordan, the Olivo court did not do that. What the Olivo court did, and this is where the assignment of error specifically comes in, is to admonish all courts thereafter looking at this issue to look at multiple factors and not merely legal status. So maybe you could tell us, what is the limiting factor? What do you suggest? So there are two constellation of factors that the Olivo court really insisted that future courts should look at in determining the extent of duty. One, and this is the most important principle, is the foreseeability of the harm. That was before Virtus. Virtus was decided in 2013 by this court. That's correct, and that was actually dissimilar. And foreseeability was not deemed to be the important thing anymore, that the paramount importance of foreseeability has been diminished, and the important thing is fairness considerations and public policy concerns. Agreed. And Justice Holmes said in very clear language in Virtus that we have to find a solution not just for the particular case, but generate intelligible and sensible rules to govern future conduct. I agree. So given the facts here, which are deemed to be true, the facts in the complaint, and they're not disputed in terms of the relationships at issue here, I don't know, can you use the word girlfriend? If you're looking at foreseeability, go back to the late 70s and early 80s, what is foreseeable then? Correct? But we're not looking so much at foreseeability. It's not merely foreseeability. I completely agree. So the second constellation. So let's say she was a romantic partner. I mean, you say in your complaint she frequently visited the apartment, including, quote, spending many nights, end quote, there and wandered so close. So let's just say she was a romantic partner there some of the time, right? How do you define romantic partner? Your Honor, this is a very conventional. What makes one a romantic partner? So this is a very conventional relationship in timeline. So recall that the Schwartzes were boyfriend and girlfriend in 1978 and 79 when Mr. Schwartz was working at Acuratus. They became engaged and got married in June of 80. They've been married ever since. And so what we have here is a period that straddles both the premarital and marital relationship, number one. Number two, there are two sources. Isn't it the case that he had gone from Acuratus by the time they got married? That is factually correct. However, there are two sets of facts that are critical here that were not examined closely enough by the district court. And if I may, let me tell you what they are. Fact number two is they were roommates with another employee of Acuratus. We know that. We've read this. No, no, I know, but the district court didn't consider that in its analysis. But let's talk about, I'm going to push this a little bit, the practicalities of setting up a rule. How long must you be in a romantic relationship? However it's defined. Must it be as long as your clients were? Can it be a week? Can it be a month? Must it be five years? It's going to be a case-by-case analysis. And how long must you be a roommate? Judge Barrett, it must be a case-by-case analysis. And if we learn nothing but this from Olivo, it's that the courts considering the extent and scope of duty has to look at a multitude of factors. And the specific assignment of error here is that that was not done. Wait, hold on, Mr. Honig. When you say the assignment of error is that that wasn't done, you seem to be blowing past the assertion in Vertis that we can't get too case-specific. I mean, that's the point. It's the discussion in Vertis that says, you know, if you're going to set up a rule that's so fact-specific that it just deals with that case, okay, but that's not what we're in the business of doing. We've got to lay down a rule that's got more general applicability. So when we look at what you're asking us to do, we have to ask ourselves, are you pushing us past Olivo, and does that make sense? Now you said Olivo doesn't do what I tried to describe it as doing, so I'm going to read to you the language from Olivo itself. It says, quote, the duty we recognize in this circumstance is focused on the particularized foreseeability of harm to plaintiff's wife, who ordinarily would perform typical household chores that would include laundering the work clothes. Accordingly, public policy concerns about fairness and proportionality of the duty recognized today should dissipate. That sounds like the Supreme Court of New Jersey saying, don't worry, it's not whoever happens to be laundering in and out of the house. It is the wife. Don't worry about it. You seem to be saying, well, even if we're not suggesting anybody who wanders in and out, it's not just the wife. So you're asking for an expansion. You'd admit that, wouldn't you? I wouldn't. Oh, my gosh. Here's what I'm asking for, if I may say as clearly as I may. Olivo and Virtus are completely consonant on this issue. There are two constellation of factors, one of which is foreseeability of harm and the status of the party, the ease with which the harm can be addressed, and the fundamental fairness to the tort visa or proposed tort visa. The two cases are completely consonant. We have purposely not asked this court to make a concrete expansion of Olivo by saying someone who is a girlfriend for X months or Y months. What we're asking this court to do, and recall this case was dismissed on the pleadings. Hold on just a second. How can it not be an expansion? You say we're not asking for it. If Olivo's facts are it's the wife, and if the Olivo court says expressly don't worry about policy concerns because we're talking about the wife, how can it not be an expansion for you to say don't focus on the legal marital relationship, which is what you're asking us, right? I'm asking this court, respectfully, to read Olivo for what I think it stands for, which is that it happened to have been a spouse in that situation, but the admonition of the Olivo, the Supreme Court of New Jersey, is not to be stuck simply on legal status and that every future court considering it either on summary judgment or on the pleadings, as was done here, must look at a constellation of factors. I may agree with you completely on that, Mr. Honick. I may agree with you completely that the court was saying don't get bound up with old-fashioned notions of invitee, licensee, trespasser. We're not talking about that anymore. We've gone beyond that here in New Jersey. I'm struggling with one thing and one thing only, and that is when the Supreme Court of New Jersey is at pains to say at the very end of its opinion, its closing words, don't worry about this getting too broad. We're talking about the wife, so it's foreseeable. Even if the rationale of Olivo could reasonably be taken to go beyond the wife for the reasons you're describing, isn't it just as a matter of plain black and white on the page that it's going beyond Olivo to say it's not just the wife? Your Honor, I think that one could look at it with narrow blinders and read the word wife as a limiting bright-line test. The clear language of Olivo is that there shouldn't be a bright-line test, but instead courts must look at factors. So here's the logical extension of reading Olivo as, Your Honor, I think maybe looking at it, if the Schwartzes had been married and they had two children, and this happens in real life with beryllium, trust me on this because I've represented these families, and you had a spouse that got chronic beryllium disease and a child or two children as I've represented, it cannot be the jurisprudence of this circuit or New Jersey to allow a recovery for the wife and not the children. I don't think any of us would suggest that. That's the logical extension of reading Olivo as narrowly as that. And Olivo doesn't restrict it to wife, but that is all that was before it. I agree, that's all that was before it. But to extend that to romantic partners and roommates. We haven't asked for that respectfully. We asked that the case be remanded so that the Olivo factors can be considered by the trial court to determine properly what the scope of the duty is. I think Judge Berry's put her finger on it, and then we're just maybe talking past each other a little bit. I don't think anybody on this panel is telling you we've made up our mind there's a bright line test. What we're trying to get you to grapple with is that you are going beyond Olivo terms. Now, it may be that the logic of Olivo is such that it makes sense to expand it to other members of the household. I'm certainly not trying to tip a hand one way or another on what my thinking on that is. What I am trying to do is to get an acknowledgment and an addressing of the consequences of this does step past where Olivo went. Because it didn't have to go past wife, and it said it's the wife, don't worry about it. And then that raises the question, well, if we go past that, are we the ones to go past it? And if we are, how would we state a limiting rule? Those are the things that I have perhaps in our fleet been trying to get you to grapple with. And, Judge, I don't want to be mired in semantics. I completely agree that I'm inviting the court to consider going factually past Olivo, obviously, because we didn't have a self. But we are a federal court sitting in diversity. We have to predict what the state court would do, right? Wouldn't that be what we do here? We have to look at what you've alleged and say would be. Would the Supreme Court of New Jersey say that when he was the girlfriend during that period of time, before they got married and after they got married, he worked for, what was it, the other company? It was not working. Mature ambush. Yeah. I think this court respectfully. Or the roommate. I think respectfully this court can do one of two things. I think Erie v. Tompkins absolutely empowers you to make a predictive statement about the scope of Olivo. I do. But I'm also aware the jurisprudence in this and every circuit in this country is restrained. I believe you can render an opinion remanding this case back to the district court with instructions to do what Olivo and Virtus require courts to do when applying New Jersey laws in this area, and that is to look at all of the factors, not merely legal status. The court can narrowly, that's why I said narrow at the outset. The court looked at the roommate. The district court looked at the roommate and actually held it in on the negligence count as to the roommate and then it settled as to the roommate. No, no. Respectfully, that's not at all what happened. All the negligence counts as against accuratus were completely dismissed. That's right. And this court, the district court, did not look at any of the issues of fairness that Virtus considered and, frankly, that Olivo considered. The court has to look at how easy it is to remedy. What I'm saying is the district court did consider the roommate and held it in as to the company did hold him in. No, on the contrary. No, you're right. We are completely dismissed as to accuratus on negligence counts for roommate and for boyfriend, subsequent husband. We're out of court on that. You need a program to follow the players here. I agree. It does take a little bit of looking at time and relationship. But respectfully, the assignment of error truly is narrow. I don't think it's impingent on this court to decide what that scope is. I think you can and should respectfully send it back for all of the elements of both Olivo and Virtus to be considered by the court. You mentioned the procedural posture here. It's on a motion to dismiss. Is that significant? Very significant. Why is that? Well, because the law is well settled. It's black-letter law. Then unless you have a developed record on the specific facts, it would touch on the scope of duty. But it's impermissible for a court at the 26th stage to dismiss the claim. Well, when you moved to certify the case for interlocutory appeal, you argued that the issue of whether accuratus owes a duty to Brenda  and required the interpretation of New Jersey case law, a task that by definition does not depend on factual circumstances. And the facts alleged in your complaint are deemed to be true. They're not disputed. That's correct. And make no mistake about it. I believe that the district court absolutely could have, if it applied the appropriate standard under Rule 12 and taking all the facts to be true and looking for any view of those facts that would support a finding in our favor, I think the district court could have concluded that. But to the extent there was any uncertainty about the elements of Olivo and Virtus, meaning the fairness, the ease. For example, we didn't plead how easy it would have been for them to cure the take-home exposure. If the court were inclined to get facts on that in order to rule whether the duty extended. What about another girlfriend that he lived with? I mean, this is where it's. . . Your Honor, the slippery slope argument has been raised in every one of these scope of duty cases. It should be. And it's caused the court's real consternation. It has. That's why in Olivo it's the closing words. That's why in Virtus, near the very close of the argument, of the opinion, the court says we have recognized that a carefully drawn articulation of the duty can serve to confine a defendant's exposure to liability by addressing a specific articulable risk. This seems to be the New Jersey court saying, and saying again deliberately, hey, all you people out there, don't panic. We're not trying to throw the gates open to everybody. We're talking narrow, foreseeable, et cetera. Agreed. And the question is how it's formulated. We're not throwing it open to anyone outside of life. That's the interpretation of this district court. Or we're not throwing it open. We're doing what courts do, and that is giving good benchmarks for how to apply the principle and inviting future courts to determine. And the benchmark is, and this goes, and we're out of time, so maybe we'll just talk in service here. But, you know, and we haven't even begun to talk about something that I'm going to ask your opponent about that I'm interested in, and that is, is it the formation of the duty that's the issue in all of O, or is it proximate causation that's the limiting factor, right? Because the court says foreseeability is a factor in both, and then seems to spend a good deal of time talking about what is, in essence, proximate cause as the limiting feature. But, you know, we could keep going on this all day. Thank you, counsel. Good morning, Your Honors. My name is Joseph Farakka. I'm with the law firm Becker Mizell, and we represent the Apali Akaratis Corporation. With all due respect to opposing counsel, I think he's minimizing what he's asking this court to do. Essentially ---- Before you go there, I'll just ask my question, the opener that I asked him. Should we be certifying this case or not? Your Honor, it's clear under the case law that we cited. Okay? City of Philadelphia and Sheridan. That you have acknowledged ---- Counselor, can you please, we're recording this. You've acknowledged significant restraints on your abilities to extend state common law in diversity cases. Okay? And so what he's asking for in this instance, and we cannot minimize it, is that he's asking for you to recognize a duty on the part of employers in the state of New Jersey, similarly situated to Akaratis, to a complete new class of plaintiffs. Well, that's really the question, right? It's whether he is asking us to extend that to a complete new class. They say in their briefing, and you've heard him argue it here today, we're not asking you to do that. We think Alivo can rightly be read to mean not just the wife, but someone, as it says elsewhere in the opinion, someone like her. Someone like her. That's the language that they use. So if we read the case and we say, well, you know what? You could read that case to be a little broader than the wife or not. And whether you read it to be broader or not, that's a pretty important public policy question. So should we give it to the New Jersey Supreme Court to decide that? Or should we make a prediction about how the New Jersey Supreme Court would read and apply Alivo? With all due respect, Judge Jordan, I think it goes beyond that because this court would be acting as a judicial pioneer. What he's asking for is what no state court has ever determined. He's asking for the take-home liability to be applied to not only a spouse, okay, but other state courts have addressed family members within the household who have been exposed to employees over an extended period of time. This court would be predicting that the state of New Jersey wants to be a trailblazer when the majority of the courts that have decided the issue of take-home liability have basically determined that there is no take-home liability. The Alivo court is within the- I'm not so sure you're right that the majority of courts have. There are several cases that each side can and have cited to us, but without counting them up, which I haven't done at this point, I'm going to try to get one last time you to respond to my question. And I think what you're saying, if I understand you right, is there's only one way to read Alivo. And so there's no reason to certify this because no person could rationally read Alivo to mean anything except spouse and only spouse. Have I got you? That's the answer to the question. I apologize if I danced around it and I didn't address it specifically at first. The Alivo court and the district court rightly saw specific restrictive language in that decision, which you seized upon earlier during counsel's oral argument about a particularized receivability of harm to the plaintiff's right. Why didn't the court, when it was talking about this elsewhere, why did it use language like this? Determining whether a duty existed, that foreseeability of harm is key. So we're describing the appellate division here and then saying immediately after that, the risk of harm to someone like Eleanor from exposure was foreseeable. And then that's the way the appellate division read it. Then the Supreme Court picks up on exactly that language and it too says, applying these general principles, the risk of injury to someone like Eleanor Alivo is one that should have been foreseeable. What do we make of that language? I would say like being a spouse who on a regular, inconsistent, and in fact nightly basis, washed the contaminated clothes of her husband. A child would be, don't you think there would be a need to a live-in child? I will admit that to the extent that Mrs. Schwartz was a child, to the extent that we utilize the narrow example and hypothetical that opposing counsel used, that would be a different situation. Because there, the Alivo court has already talked about particularized receivability of harm. Because a child is a family member. Because they're in the house all the time. They're in the house all the time. In fact, the Chasen court, the Chasen court, the Louisiana court of appeal that he cites in his papers. How about, hold on, how about, you know, we're living in the world we're in today, right? So whether a person's morality or religious faith or anything else thinks it's a good idea or not, there are many, many, many couples who cohabitate for years before deciding to marry. So if it's only married spouses and children, does that mean it's not foreseeable in 2015 that people are going to be living together and sharing household chores? I'd like to address that in two ways. One, if you look at every other court that has extended take-home exposure to an employee's family members, they talked about the issue of identifiable and limited parties. If you go down that path, you don't have the slippery slope that all the courts have been concerned about when you factor in policy and fairness concerns. And Oliva did not limit its holding to a wife. That was the facts of this case, of the Oliva case. It was a wife who did laundry. It did not say, and that's it. Is that what you're arguing? Are you arguing there's a bright line rule here? I'm arguing that the Oliva court focused on the specific facts of that case. Because that's all it had to do. It had to decide that case. But when it addressed Exxon's concerns about limitless liability, it said specifically that we're also not just looking at foreseeability, we're looking at policy and fairness. And that's why verdicts are so important here. We are establishing a rule, too, that's workable and simple and intelligible. Exactly. But I also want to get back to George Jordan's question about the societal changes that have taken place over the last 35 or 40 years. I admit, I was around in 1979 and 1980. Things were a lot different back then. In fairness to my client, Vernis talks about Judge Barry fashioning a solution that's fair and appropriate to the case before the court and also developing rules that could guide future conduct. But in order to be fair and appropriate to my client and impose liability, the court has to look at this issue as to what was foreseeable, who had foreseeable conduct. The precise question here is what we do with it. The other question is whether under New Jersey law an employer has a duty to a roommate and or a non-cohabiting girlfriend or boyfriend of its employee to protect him or her from take-home exposure. Right? Yes. That's the precise question here. But we also have to understand the facts. The time that she had a relationship with any Akaratis employees were in the late 70s and 1980s. Isn't this summary judgment? Isn't this summary? We have to assemble all the facts here. I mean, you're arguing a factual matter now. At this juncture, we're... I'm not arguing a factual matter. He's saying she's around a lot. She stays over a lot. No, that's not disputed. There's no need for a full record. He wants a remand for no reason. If you look at paragraphs 7, 8, and 9 of the amended complaint, the status of Brenda Schwartz and her relationship to the two former Akaratis employees can never change through discovery, Your Honor. With all due respect, if we assume... And they were both opposed. Exactly. If we look at paragraphs 7, 8, and 9 of the amended complaint and we assume them to be accurate for purposes of this appeal, as the district court did, and draw every reasonable inference in favor of the appellants, then what's the need for a full and developed factual record? There's no change to the relationship. So accepting that's true, then the relationship we're talking about here, if we draw all the inferences, is Brenda is over there lots practically living there on a regular basis and helping out around the house and doing the things that are spouse-like, okay? If we accept those facts as true and we accept that we have to craft a rule that's going to have application beyond the Schwartz's, the question then remains, doesn't this implicate policy questions about what's foreseeable or not in today's society in New Jersey? And if it implicates those policy questions, isn't that something that is going to require a decision that takes us perhaps beyond legally and lawfully wedded? Yes, it does, but I would submit to Your Honor that the proper body to make that determination and to determine both the social benefits afforded to recognizing a duty to a new class of individuals that are unmarried, okay, and who are just merely roommates, should be the province of the New Jersey Supreme Court because New Jersey Supreme Court or the New Jersey legislature should have an opportunity to weigh in and say social benefits and social consequences. So what you're saying is we ought to certify it. Did I get that right? So what you're saying is we ought to certify it. We ought to take this question, certify it for the New Jersey Supreme Court, because they're the ones that ought to make that kind of policy call on this record. I mean, you could certainly make the argument, you could definitely make the argument, that that's a New Jersey legislature responsibility, but the New Jersey Supreme Court, having made the decision that it was going to broaden traditional tort law, which was within its province to do, has opened this door up. Shouldn't they be the ones to decide just how far the door swings? Well, Your Honor, I don't know if you need a certification. The bottom line is you have visibility. I don't know what to make of your previous statement then. You have visibility as to what the Supreme Court of New Jersey felt comfortable with. They felt comfortable with invoking a duty on the part of an employer. But that was the only facts before him, as Judge Barry said. That was the facts of the case, and that's all they had to decide. Based on this case, based on the facts, is there anything that would even suggest that the Supreme Court of New Jersey would find, you know, that the employer has a duty here? But we're also looking back at the late 1970s, 1980s. That's the foreseeability part of it. But we also have to look at what was fair from the standpoint of foreseeability and what's fair with respect to the imposition of a duty of an employer back in 1979 and 1980. Well, let me give you a hypothetical. How about this? How about a cohabitating, you know, they said for decades they were together. Let's say it's a cohabitating same-sex couple. They couldn't have gotten married. They're out of luck too? I'm not suggesting that at all, Your Honor. What I'm suggesting is that this Court has certain restraints, which is acknowledged in its various opinions, not to be a judicial pioneer, not to engage in judicial activism, not to extend the common law of a state, and to defer to a state court or a legislature to do the very thing that the appellants are advocating this court to do and advocated the district court to do. And the district court properly refrained from doing so and determined that the only duty recognized to date by the state of New Jersey was in order to the benefit of a spouse who laundered laundry over a 37-year time frame. And that was consistent with the minority of courts. I'll take issue, Judge Jordan. I believe it is the minority of courts that have found take-home exposure liability as opposed to a significant amount more courts that have determined there's no take-home liability whatsoever. And all of the courts have said it's either the spouse or related family members, so as to limit and specifically identify the class we're talking about to address policy concerns about limitless liability and vast costs for employers. Your statement about policy concern prompts me to want to ask you with the time we've got left on the clock here about analytically whether we're talking about the duty or proximate cause here. There's language in Alivo as follows. Alivo says foreseeability has a dual role in the analysis of court responsibility. And then it goes on to say as a determinant of duty of care as well as a determinant of whether a breach of duty is a proximate cause of the ultimate injury. It goes on to say here we're focusing on the determination of the duty and then it says once the ability to foresee harm to a particular individual has been established, however, considerations of fairness and policy govern whether the imposition of a duty is warranted. I take that to mean, or maybe I'm reading too much into it, that the court is saying we're going to recognize a duty here and then we're going to put a proximate cause break on it and say because in this circumstance don't get worried all you people about unrestrained liability. As a matter of proximate cause, we're talking here about, and the way they put it, is the spouse. So the question I'm putting to you, and I'll put to your colleague here in a minute, is as we look at this and we try to analyze it, is what you're putting before us right now a question of whether there's a duty to Brenda Schwartz or whether the duty described is out there and just policy concerns, proximate causation should prompt us to say, no, it doesn't go past the spouse and doesn't make any difference. I didn't read the case as you may be reading it and perhaps you have greater insight as to the proximate cause argument. What I looked at it was that first, before Virtus, there was a real specific focus and discussion on the foreseeability part and only after determining whether or not there was foreseeable harm to a particular party, then whether or not there would be an imposition of a duty has to deal with policy and fairness concerns. What I saw the court do there is say there's clearly, on the part of Exxon, given the facts of this case, given the longstanding period of time that she was washing her husband's contaminated clothing, and given the fact that she had regular and systematic contact with those clothes and with her husband, that she clearly had, there was a particularized foreseeable harm to her. Now, what are we going to do with respect to developing something that doesn't result in a simple result of limitless liability? Well, we have to identify specifically the class of parties that we're protecting and we have to limit that class. Otherwise, this basically can get out from under us. And you can have Judge Barry make some very good points about a babysitter. You can see dry cleaners, a taxi driver, people on the bus that he takes on a regular basis. A one-night stand. I heard that word. I heard that phrase. Exactly, Judge Barry. So I didn't look at it from a proximate cause standpoint, Your Honor. Okay. But I looked at it more from foreseeable first and then policy and fairness considerations with respect to the fact that employers have to have some constraints on their liability or the cost of doing business would exceed their economic incentives to do something. But even your own policy, I mean, you bring up legitimate points, but the question is whether this Court's the one to weigh all that. And I understand, and we would submit with due respect, Your Honor, given that it's a diversity case, that isn't it incumbent upon you to engage in the judicial activism that the appellants are asking you to do so? Thank you so much for allowing me to go a few minutes over time. Thank you, counsel. Members of the Court, I think there are two jurisprudentially sound things to do here. The first is to recognize that Olivo did not create a bright line test limited to spouses and, in fact, does speak to people like Mrs. Olivo. If you recognize that principle and if you look at what Olivo tells us, you can narrowly remand the case for the District Court in this case to do what Olivo demands. Let me read this, if I may. The Olivo Court explained that after foreseeability of an injury is established, the Court has to consider, quote, considerations of fairness and policy, and the Court dictated that the fairness inquiry must involve weighing and balancing several factors, including the following, the relationship of the parties. We've talked about that at length here, and the District Court considered that factor and only that factor. Olivo says you have to consider the nature of the attendant risk. You have to consider the opportunity and ability to exercise care and for the public interest in the proposed solution. Here's the challenge. When you say the District Court didn't look at those other things, even if we were to assume that every one of those things ran in your favor, those other ones besides relationship, we would still have to wrestle with, or the District Court would, with the relationship issue, right? I mean, that's the key question. That's why we've spent here talking for a good long time almost exclusively about the relationship and how far you go past just spouse, because that's the operative problem posed by the ruling you want from us, isn't it? But, Your Honor, the relationship is just one of multiple factors. Yeah, but I'm saying the District Court can give you everything. Just give you everything other than that. But, Your Honor, if this panel were to decide, and it's completely within your power to do this, to say we, sitting in diversity, read Olivo as not creating a bright-line test that's limited to lawfully married individuals, that you can be like Mrs. Olivo, and when we look at the other factors that describe scope of duty, that's where the line will be drawn. Courts do that all the time. And I think the jurisprudentially sensitive thing to do is to follow the lead that the Supreme Court in New Jersey has given us, both in Olivo as well as... Mr. Honig, that's the, you know, I know you want to pose this as it's no big deal. It's the lead they've given us. It's a very big deal, Your Honor. Indeed, it's a very big deal. It's a very big deal, and that's why I'm a little surprised that you're not willing to say, you know what, this implicates important public policy issues under the law of the state of New Jersey, and New Jersey ought to have the one that ought to make the call if they're willing to take it. Your Honor, make no mistake about it. This is a big deal. I'm speaking at the level of legal analysis and the framework that I think this court has at its disposal to consider the question which is very weighty. I make no light of the fact that this decision that you will make will be looked at and read by employers as well as individuals like Mrs. Schwartz, who's in her 50s, who's tethered to an oxygen machine, who will almost surely have a premature death from having been exposed to beryllium, brought home on the clothes of her husband, when he worked in a facility that had zero, zero environmental controls. The public policy of New Jersey screams for this court, for this case to remain in play and to not have an unduly restrictive reading of Olivo, which is not required. So does it matter? Is it just too many angels dancing on the head of a pin to try to think about this? Are we talking about duty? Are we talking about proximate cause? Your Honor, I have to agree with my opposing counsel. I do not read Olivo as speaking to causation at all. I read Olivo and Virtus as defining scope of duty, because in the absence of duty, there can't be a tort. It certainly doesn't speak to causation in fact. That's clear. The question is, why does the court go out of its way to say foreseeability has two roles, duty and proximate cause, which is a policy break, and then spend some of its time talking about the policy break, although it never refers to proximate cause again. I grant you that. Well, I think it goes to the nature of the attendant risk and the opportunity and ability to exercise care, because certain toxins, certain operations are so exotic or rare or unusual that the risk can be viewed as very finite and the ability to cure it very high. But that's not what we have here, and unfortunately the district court never weighed those factors. That impacts scope of duty. And I think if the district court had looked at those factors, either from the pleading or had it sought an expanded factual record in order to define scope of duty, it would have found easily, as the Tennessee Supreme Court, the Maryland Supreme Court has found, that this duty should extend to any household member. Yes, and the cases you cite are all children living at home. Well, respectfully, Judge Barry, some of them are spouses. I'm saying beyond spouse. That's the only expansion there. This is nowhere near that. Well, remember that there are two sources of exposure here, and I put this out because the district court didn't really address this, nor, frankly, does opposing counsel in his brief. The two sources here are not only the boyfriend, subsequent husband, but the roommate. Recall that for three-plus years after the Schwartzes were married, although Mr. Schwartz stopped working at Accuratus, they continued to live with Mr. Altimos, who was a manager there. Right, and that raises all these policy issues again, right? Is it the responsibility of Accuratus or ExxonMobil or Metallic Brush or some other firm to say, you know, we can see from your employment information you're married or that you have designated someone as a beneficiary or you have a civil union partner, but is it incumbent on them to start asking, do you live with somebody? No, not at all. How much time are you living with? See, this is where you get into trouble with the practicalities here. I mean, this roommate lived with citizens for years. What about a week, two weeks? The United States of America should be able to define their own household. That means someone with whom you regularly live. That's a household member. Okay. And an employer doesn't need to pry. No, respectfully back to you, accepting that they can define their own household doesn't mean that they're allowed to define their own household in a way that puts liability on an employer necessarily, right? If I want to define my household to be and the people I love who visit me on an occasional basis, that's my family. Does that mean? Courts examine that question all the time. We can't always have a bright line rule. That's what Alivo suggests. We can't, this panel will not be able to design a rule that will cover every factual situation. Does the employer have a duty, a duty to protect from a roommate moving in? Your Honor, it depends. Who is there for a week or six? It depends what a roommate means. If it's a week, the answer is likely no. If it's two years, the answer is likely yes. So that's what the rule, that's what Burtis says we have to, it would have to be addressed in specific intelligible terms. We can't say well. That's why Alivo gave us the benchmarks they did. I just read them to this court. All I'm asking this court to do is to send our case of a fiancé who became a spouse and was simultaneously a roommate back to the district court to weigh all of the Alivo factors. She was a non-cohabiting girlfriend when they lived together. I don't know when she became a fiancé, but I haven't seen that word used too much here. Well, we know they were married in June of 1980. They started dating in 1978. Yes. She was a frequent cohabiting guest overnight. She did the towels and cleaned the apartment for both of the roommates. Well, what is cohabiting? I think that's one of the questions that's a little doubtful. And respectfully, I'm only suggesting we don't have to get stuck on those definitions because the line can't be a bright line. She didn't live there all the time. Agreed. Until they were married in 1980. And then for three-plus solid years, she did the laundry of both of these gentlemen, and one of them she did the roommate's towels. Only the towels. Well, so one of the things that Alivo says to look at is the nature of the risk. So less than a thimbleful of beryllium exposure for less than one month can cause chronic beryllium disease. We're only dealing here with a question of the employer's duty. To whom? And the scope of that duty. And it just seems this is potentially enormous. Or not. Or we can trust the district courts and the trial courts of America with wisdom from the appellate court in applying the standards that are here. We could say it's almost because it is so limitless. You know, as a matter of ---- Your Honor, I read Alivo as presenting limits to apply benchmarks and criteria that I think are highly manageable, that courts in our federal and state systems do every day, week in and week out. I've been doing it for 35 years, and courts succeed in doing it. The only error we assign here, with respect to both of the district court judges, remember the issue first came up on our motion to remand, and this was relegated to a footnote where nothing more than the legal status of Mrs. Schwartz in 1978 and 79 was decided. You can send this back respectfully with a remand saying, look at all of the Alivo factors to determine scope of duty because this panel, sitting with an eerie prism, has decided that Alivo should not be read as creating a bright line. That's what we're asking you to do. Let me ask you another thing. You brought it up before. Could you just tell us a little bit about beryllium exposure? I know that asbestos, you know, even one exposure to asbestos can get you mesothelioma. So people, Judge, in the toxic area say that asbestos is like candy next to beryllium, and the reason they make that dark joke is that beryllium, pound for pound, inch for inch, is the most toxic substance known on earth. It's unusual, though, because it's immunologically mediated, meaning it works like an allergy. You can have a worker who can work with massive quantities for 30 years, never contract it, and you can have someone like Mrs. Schwartz sitting at home doing towels be exposed to less than a thimbleful, and she can contract the illness. But at one exposure? Not a single exposure. The medical literature suggests that you have to have something approximating a month or more of exposure. But it's not a dose-response relationship. It's not like cigarettes where the more you smoke, the more likely you are to get sick, or asbestos. It's immunologically triggered. And so the medical and scientific literature is replete with case studies of people like Mrs. Schwartz, like children at home. You can't have passing. You can't have, for example, a dinner guest and likely have them contract CBD. You have to have regular exposure. So that's an internally limiting factor in the science here. And candidly, it may be one of the things that the district court should look at in determining scope, because the nature of the toxic element may define the reasonableness of having an employer address it. And none of that was done here, and that's the assignment of error we give. I just want to go back to something I brought up earlier. In terms of the limits to an employer's liability, and I asked you if this was your position, and you agreed that it was, and this is at the Blue Brief in 22, where the limitation should be to, quote, members of an employee's household or to individuals coming into close and frequent contact with the employee, end quote. Yes, Your Honor. And, Your Honor, thank you for reminding me. That's a limitation? Your Honor, I suggested, and I still suggest, that there are two jurisprudentially sound things this court could do. One is to remand for the reasons I've already set forth. The other is to actually render an eerie prediction about what the New Jersey court meant or is likely to mean given all of the common law in New Jersey, that ALEVO stands for the proposition that household members are protected, period. That is a limiting factor. I think that's the other thing that this panel can do. If I were sitting in your robes, I would choose path one, because I think that's the narrower holding, which doesn't require you to go out, if you will, potentially on a limb and make a judgment about what the limit is. It just forces the district court to go out on the limb. But that's the job of the district courts, Judge Jordan, respectfully. I think ALEVO. On matters of fact, it's certainly the case that the district courts are positioned and ought to be making calls in the first instance. But, you know, the district courts, is the district court in any better position to make a judgment on a question of law than we are? Well, but it's a mixed question if you look at ALEVO. Now, Spring Court says, Spring Court of New Jersey said, scope of duty is a question for the court. Oh, I agree. I'm not disagreeing, but I'm saying for the court to determine the scope of the duty, it has to weigh elements of fairness. And I read to you what the four elements were, and all I'm saying is that our district court here didn't get the opportunity to do that. If it does, it can then render a legal judgment about scope of duty. And respectfully, that's what the district courts are there to do. And this is not an instance where the New Jersey Supreme Court either hasn't spoken on the subject or hasn't spoken clearly. It has spoken clearly. It has delineated the elements. With all respect, if it had spoken clearly, we wouldn't have spent the last approximately hour talking about it, right? We would have saved a lot of time. It did speak clearly, but it spoke about a wife because those were the facts of ALEVO. But it spoke, I think, rather eloquently about the idea of not getting stuck in legal status of individuals to determine if a duty attaches. And it gives us a pathway and criteria to look at. And all I'm asking on behalf of the Schwartzes is that you allow the district court to apply all of the ALEVO elements and give an opportunity to define scope. Thank you, counsel. Thank you. We'll take a case under...